```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LINDA J. MARCUS,               )
                               )
          Plaintiff,           )
                               )
     v.                        )    Civil Action No. 03-1790
                               )
METROPOLITAN LIFE              )    Judge Cercone
INSURANCE COMPANY,             )    Magistrate Judge Hay
                               )
          Defendant.           )
```

REPORT AND RECOMMENDATION

I. RECOMMENDATION

It is respectfully recommended that the motion for summary judgment submitted on behalf of plaintiff (doc. 21) be granted in part and denied in part. It should be granted as to Count I since MetLife's termination of her disability benefits was arbitrary and capricious. Her motion should be denied as to Counts II and III of the Complaint. Defendant's cross motion for summary judgment (doc. 27) should be granted in part and denied in part. It should be granted as to Counts II and III and denied as to Count I.

II. REPORT

Plaintiff, Linda J. Marcus ("Marcus"), commenced this action pursuant to the Employment Retirement Income Security Act ("ERISA"), Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), claiming that she was improperly denied benefits under the long

term disability policy (the "Policy") issued to her employer, Henderson Brothers, Inc., by defendant Metropolitan Life Insurance Company ("MetLife").  See Complaint (doc. 1).

The record demonstrates that Marcus was employed as a commercial property and casualty customer service agent by Henderson Brothers, Inc., in its office in Pittsburgh, Pennsylvania, from October 11, 1999 to October 21, 2001.  Marcus participated in her employer's long term disability plan ("LTD Plan"), through a group policy from MetLife.

On December 14, 2001, Marcus applied for disability benefits under the LTD Plan due to: "dizziness/vertigo with tinnitus, nausea, headaches with concentration problems, neck/joint pain and muscle tenderness, extreme sensitivity and intolerance to chemicals and pesticide spraying in workplace and neighboring construction site.  General weakness/easily fatigued.  Episodes of low-grade fever, chronic urinary tract/bladder infection with abdominal/lower back pain."  Doc. 29 at Ex. B.  In support of her application, Marcus presented to MetLife the following materials: (1) a letter dated January 18, 2001, from Dr. Joseph T. Joseph, an internal medicine specialist, who indicated that he had been treating Marcus for residual symptoms (joint pain and fatigue) from Lyme disease, and that he believed she was disabled because of environmental allergies, referring MetLife to Dr. Roy E. Kerry, who was treating Marcus for her

allergies; (2) an attending physician's statement from Dr. Kerry, her treating specialist in otolaryngology and environmental medicine, indicating his primary diagnoses of chemical sensitivity, hypothyroidism, and autoimmune disease, with secondary diagnoses to include chronic fatigue dysfunction; and (3) test results performed in August of 2001 which purported to support Dr. Kerry's diagnoses.  Based upon this information, MetLife approved Marcus's claim and paid disability benefits through January 10, 2003.

MetLife terminated Marcus's LTD Plan benefits on January 22, 2003, indicating that MetLife did not have "sufficient medical documentation to support disability from your occupation in accordance with [the Policy] ... beyond January 10, 2003."  Doc. 29 at Ex. E.  MetLife noted that "the normal recovery period for this type of illness is one to two weeks."[1]  Further, MetLife took issue with the medical records, stating that they provided no documentation of allergies, hypothyroidism or adhesive capsulitis of the left shoulder.  Further, MetLife explained that the Personal Profile Evaluation form Marcus completed on December 8, 2002, indicated that she was able to take care of her personal and household needs, to drive to her therapy and doctors' appointments and shopping, and to do some

---

[1] In the notice of termination, the "illness" is not specifically identified nor is the source of this conclusion.

short distance walking.  MetLife also determined from Marcus's job description that she was not exposed to chemicals in the office and that her job was sedentary.  MetLife concluded that the medical records provided no objective findings to support Dr. Kerry's restrictions and limitations and, thus, Marcus was not prevented from performing her sedentary work.  Finally, MetLife noted that it was not disagreeing that Marcus had a condition,[2] only that there was no medical evidence of severe symptoms beyond January 10, 2003 that would prevent her from performing her occupation as Customer Support Tech.

      Marcus appealed the termination and submitted the following materials in connection with the appeal: (1) letter dated July 2, 2002, from Dr. Kerry; (2) medical records from Dr. Kerry from August, 2002 through April 2, 2003, including results of laboratory tests; (3) letter from Dr. Kerry dated March 14, 2003; (4) letter dated January 27, 2003 from Dr. Joseph; medical records through January, 2003 from Dr. Joseph; and (5) lab results and radiology exam relating to Marcus's Lyme disease and thyroid problems.

      The July 2, 2002 letter from Dr. Kerry indicated that he considered Marcus "totally disabled for her own occupation and any occupation due to her severe degree of chemical sensitivity

---

[2] MetLife did not specifically identify the condition(s).

reactivity affecting the otologic system, orthopedic joint systems and upper respiratory irritation." Further, Dr. Kerry referenced laboratory documentation supporting the diagnoses of autoimmune thyroiditis, early lupus syndrome and generalized autoimmune syndrome. Dr. Kerry also opined that Marcus had "chemical sensitivity, fatigue syndrom, fibromyalgia type symptomatology and generalized arthritis." Dr. Kerry indicated that Marcus was under medical and nutritional support for her problems "but her prognosis is poor due to the severity of her illness."

The March 14, 2003 letter from Dr. Kerry is addressed to the Administrative Law Judge hearing Marcus' application for Social Security disability benefits.[3] Dr. Kerry detailed the results of skin testing, "the gold standard of allergic mechanisms," according to Dr. Kerry, and demonstrating severe sensitivity to petroleum, ethanol, formaldehyde and phenolic compounds. He noted repeat testing in November 2002, the results of which showed that the "condition has remained permanent." Dr. Kerry reported that Marcus demonstrates severe symptoms within a

---

[3] On May 21, 2003, the Social Security Administration awarded Marcus disability benefits. Although the court may consider the Social Security Administrator's determination of disability in reviewing MetLife's denial of benefits, Social Security determinations are not binding on ERISA plans. See Pokol v. E.I. DuPont De Nemours and Co., Inc., 963 F.Supp. 1361, 1379 (D.N.J. 1997)(citations omitted).

few minutes of even brief, minor exposure to these toxins and must immediately leave the area where such toxins are to get fresh air.  She will remain ill for hours to one or two days, depending on the duration of the exposure.  Dr. Kerry opined that Marcus is totally disabled from any occupation because she cannot control the presence of these toxins in her work environment.

The January 27, 2003 letter from Dr. Joseph confirmed that Marcus again tested positive for chronic Lyme disease and was being treated for same.  Further, Dr. Jospeh opined that Marcus was totally disabled from any occupation due to all of her chronic problems, including but not limited to Lyme disease, chemical sensitivities, chronic fatigue, poor endurance, stress intolerance, joint pain, dizziness.

By letter dated June 12, 2003, MetLife denied Marcus's appeal.  MetLife indicated that Dr. Kerry did not report any physical findings concerning Marcus's adhesive capsulitis of the shoulder nor any explanation for the relationship between this disorder and her chemical sensitivities.  Further, MetLife noted Marcus's Personal Profile Evaluation and the Physical Capacities Evaluation from Dr. Kerry (December 2002) as support for the conclusion that Marcus could engage in daily activities and could sit, stand and carry five pounds appropriately.  MetLife also asserted that Dr. Joseph's January 27, 2003 letter did not reflect an opinion of disability.  In sum, MetLife determined

that "based on the medical documentation Ms. Marcus did not have impairments due to objective findings.  Ms. Marcus being totally disabled was not substantiated by the clinical documentation in her claim file beyond January 10, 2003."  Doc. 29 at Ex. M.

Following the denial of her appeal, Marcus commenced this action.  At Count I, Marcus seeks to recover benefits allegedly due her under the terms of the LTD Plan, pursuant to ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  At Count II, she brings an action for equitable relief to redress violations of ERISA or to enforce the provisions of ERISA or the terms of her LTD Plan, pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3).  At Count III, Marcus brings a breach of fiduciary duty action pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).

Presently before the Court are the parties' cross motions for summary judgment.  For the reasons that follow, summary judgment should be granted in part in Marcus's favor and in part in MetLife's favor.

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  Fed. R.Civ. P. 56(c).  See Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 501 (3d Cir. 1996).  In deciding a motion for summary judgment the court must view all inferences in a light most favorable to

the non-moving party.  Id., citing Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).  The non-moving party, however, may not rely on bare assertions, conclusory allegations or mere suspicions to support its claim but must demonstrate by record evidence the meritorious nature of the claim.  Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995).

In its motion, MetLife contends that the evidence of record amply supports its finding that Marcus's condition did not qualify her as disabled as defined under the Policy when MetLife discontinued her benefits.  Marcus, however, argues that the evidence regarding her medical conditions had not changed between the time defendant initially granted her benefits in March of 2002 and when it subsequently discontinued them, rendering the latter decision arbitrary.  Indeed, Marcus contends that her medical conditions were worsening and were complicated by other conditions.

The standard of review here is as follows:

> A reviewing Court ordinarily applies a *de novo* standard of review to a plan administrator's denial of ERISA benefits. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 ... (1989); Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 44-45 (3d Cir. 1993).  However, where the plan grants the administrator discretionary authority to construe the terms of the plan or to determine the eligibility of benefits, the court may reverse a denial of benefits only if the administrator's decision was "arbitrary and capricious."  Firestone, 489 U.S. at 115 ...; Orvosh v. Program of Group

Ins. for Salaried Employees of Volkswagen of America, 222 F.3d 123, 128-19 (3d Cir. 2000). Oslowski v. Life Ins. Co. of North America, 139 F.Supp.2d 668, 674 (W.D. Pa. 2001). See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997). The arbitrary and capricious standard of review permits a district court to overturn a Plan administrator's decision only where "it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993), quoting Adamo v. Anchor Hocking Corp., 720 F. Supp. 491, 500 (W.D. Pa. 1989). Under an arbitrary and capricious standard, review is limited to the record that was before the Plan administrator when he made the decision being reviewed. Mitchell v. Eastman Kodak Co., 113 F.3d at 440. See Courson v. Bert Bell NFL Player Retirement Plan, 75 F.Supp.2d 424, 431 (W.D. Pa. 1999), affirmed, 214 F.3d 136 (3d Cir. 2000).[4]

      Here, the Policy provides in relevant part:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for an entitlement to Plan benefits in accordance with the terms of

---

[4] By separate Order, defendant's motion to strike certain exhibits submitted with plaintiff's motion for summary judgment is properly granted inasmuch as the materials submitted were not before the Plan administrator and, thus, cannot be considered by this Court. See Mitchell v. Eastman Kodak Co., 113 F.3d at 440.

9

> the Plan.  Any interpretation or
> determination made pursuant to such
> discretionary authority shall be given full
> force and effect, unless it can be shown that
> the interpretation or determination was
> arbitrary or capricious.

(Doc. 29 at Ex. A).  It therefore appears clear that the Policy grants MetLife, as claim administrator, discretion to construe the Plan's provisions and determine the eligibility of benefits.  MetLife's decision to deny plaintiff benefits, therefore, is properly reviewed under an arbitrary and capricious standard.  <u>Id.</u>

We note here, however, that in addition to determining eligibility for benefits, MetLife also pays the benefits out of its own funds (Doc. 27, ¶ 24).  Under these circumstances, the Court of Appeals for the Third Circuit has held that a conflict of interest exists and, although the arbitrary and capricious standard may not be abandoned, the conflict requires "heightened" scrutiny.  <u>Pinto v. Reliance Standard Life Ins. Co.</u>, 214 F.3d 377, 393 (3d Cir. 2000)("<u>Pinto</u>").  <u>See</u> <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. at 115;  <u>Oslowski v. Life Ins. Co. of North America</u>, 139 F.Supp.2d at 674-75.  The Court adopted a sliding scale approach under which the intensity of review, or level of deference that should be given to the administrator's decision, should be in proportion to the magnitude of the conflict.  <u>Pinto</u>, 214 F.3d at 393.  <u>See</u> <u>Oslowski v. Life Ins. Co. of North America</u>, 139 F.Supp.2d at 675.

Instantly, it appears that several of the factors upon which the Pinto Court relied in applying a heightened abuse of discretion standard are also present here. For instance, like in Pinto, MetLife appears to have reversed its initial decision to grant plaintiff disability benefits in the absence of any medical evidence that her condition had changed. Pinto, 214 F.3d at 393. In addition, defendant's categorization of the medical evidence that was considered appears to be somewhat skewed and self-serving. Id. Under these circumstances, it appears appropriate to give MetLife's decision less deference than it normally would be entitled to under the arbitrary and capricious standard.

This notwithstanding, defendant argues that to be eligible for benefits plaintiff had the burden of demonstrating that she was totally disabled, which is defined under the Policy as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis and you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy.

(Met Life's Ex. A, Doc. 29). Further, defendant points to the definition of "Appropriate Care and Treatment," which means medical care and treatment that meet all of the following:

> 1. it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;

11

> 2. it is necessary to meet your basic health needs and is of demonstrable medical value;
>
> 3. it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;
>
> 4. it is consistent with the diagnosis of your condition; and
>
> 5. its purpose is maximizing your medical improvement.

Id.

Marcus submitted medical evidence in support of her initial disability application which included opinions and/or test data/reports from her treating physicians that she suffered from chemical sensitivities, hypothyroiditis, autoimmune disease, and chronic fatigue syndrome. MetLife apparently credited this information and found Marcus to be disabled on the basis of it. Thereafter, Marcus apparently continued to provide medical records to MetLife for review, which MetLife apparently continued to credit since MetLife paid disability benefits until January 10, 2003, at which point MetLife advised Marcus that there was insufficient medical documentation to support disability from her occupation. There is no evidence that her condition had improved or resolved or was any less severe at the time the benefits were terminated.

On appeal, Marcus submitted evidence that included the aforementioned opinions and data/reports, as well as more recent

medical records and laboratory/examination reports, which indicated that the conditions for which Marcus originally applied for benefits – and for which benefits were awarded – were worsening and complicated by other conditions.  "[O]nce a claimant makes a prima facie showing of disability through physicians' reports  ... and if the insurer wishes to call into question the scientific basis for those reports ... , then the burden will lie with the insurer to support the basis of its objection."  Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 391 (3d Cir. 2003), cert. denied, 541 U.S. 1063 (2004).

  MetLife points to the following to suppport its determination that the objective medical evidence did not demonstrate Marcus could not perform her job.  First, MetLife's medical consultant, Robert D. Petrie, M.D., stated that there was no confirmation of allergies or sensitivities and that the records were devoid of any "standard immunological" test results to show cause and effect between a particular chemical and Marcus's symptoms.  Doc. 29 at Ex. L.  We note, however, record evidence of Dr. Kerry's test results in August 2001 -- which were apparently credited by MetLife at the time of its initial decision to grant benefits – and his report of the results of skin testing, the "gold standard of allergic mechanisms" according to Dr. Kerry, which were apparently repeated in November 2002  -- indicated that Marcus's condition remained

unchanged.  Dr. Petrie apparently overlooked the skin testing results as he makes no mention of them in his report.

As well, Dr. Petrie summarily concluded that "[a]ny limitations of ability to function are related to Ms. Marcus's unusual health care beliefs ... [which] should be treated with appropriate psychological intervention."  However, Dr. Petrie offered no support for this interpretation and suggested treatment.

Dr. Petrie also remarked that "Dr. Kerry's notes are typical of practices referenced in the position papers of the American Medical Association regarding "clinical ecology."[5]  Dr. Petrie then criticizes the therapeutic use of unusual, non-FDA approved tests and the lack of standard tests.  Dr. Petrie lists Marcus's prescribed treatment programs almost disparagingly but does not identify why they are inappropriate, if indeed they are.  Nevertheless, it would appear that MetLife considered portions of these treatment records to be credit-worthy since they were presented with Marcus's initial application for disability, which MetLife granted.

Dr. Petrie claims that there is a lack of appropriate assessment and treatment of Marcus's thyroid condition, noting there should be testing and diagnostic imaging, which he implies

---

[5] There is no evidence of record to suggest that Dr. Kerry considers himself to be a clinical ecologist.

14

is absent. Dr. Petrie apparently overlooked a thyroid ultrasound on January 13, 2003 and immunology reports in November, 2002, and Dr. Kerry's examination findings on November 27, 2002, i.e., enlarged and globular thyroid, which Dr. Kerry correlates to prolonged chemical exposure. Again, Dr. Petrie criticizes the "unconventional" or "unusual" thyroid tests conducted by Dr. Kerry but does not discuss why, if at all, such tests are not credible or objective, only that they have not received the stamp of approval from the Food and Drug Administration.[6]

Additionally, Dr. Petrie opined that because Marcus retains the ability to dress, bathe and feed herself, as well as to drive to various medical and other appointments, she is functioning on a daily bases well above the sedentary level required for the performance of her previous job activities. However, "these and other minimum abilities do not equal an ability to work." Brown v. Continental Cas. Co., 348 F.Supp.2d 358, 367 (E.D. Pa. 2004)(finding that a one-time assessment, such as a functional capacity examination, "cannot hope to present a true picture of an illness characterized by variable symptoms").

Moreover, throughout Ms. Marcus's medical records there is evidence of the attempts to treat her reactions to and related

---

[6] Dr. Petrie did not indicate that FDA approval is available or required for such testing.

problems caused or exacerbated by her chemical sensitivity flare-ups, apparently without considerable success.[7]

Another MetLife physician reviewer, Dr. Gary P. Greenwood, indicated that because no documentation existed concerning Marcus's allergies or sensitivities he could not comment on Dr. Kerry's treatment, except to criticize it as "unconventional." We are not persuaded by Dr. Greenwood's conclusions as he did not mention, much less discuss, the evidence of skin testing and its correlation to particular allergens, as Dr. Kerry had noted, nor did Dr. Greenwood comment on any of the existing records concerning Marcus's thyroid.

In sum, MetLife has given inconsistent treatment to the same facts, first granting Marcus disability benefits, then terminating them. Marcus's symptoms were the same if not worsening at the time MetLife terminated her benefits as for the period MetLife granted her benefits. We find that under a moderately heightened scrutiny, MetLife's decision to terminate Marcus's benefits as of January 10, 2003, was arbitrary and

---

[7] Dr. Petrie also noted a lack of objective medical evidence as it concerns Marcus's adhesive capsulitis. We note, however, that this condition was not of primary concern in her disability application.

judgment is appropriately entered in Marcus's favor at Count I of her complaint.[8]

However, MetLife is entitled to summary judgment on Counts II and III of the Complaint. Both counts appear to assert a breach of fiduciary duty. Under ERISA Section 502(a)(2), a civil action may be brought for breaches of ERISA's fiduciary duties. 29 U.S.C. § 1132(a)(2). However, such a suit allows for recovery on behalf of the plan, not for individual relief. Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 148 (1985). Because Marcus appears to be seeking a remedy in her individual capacity and not on behalf of the Plan, summary judgment in defendant's favor on Count II should be granted based on Russell.

As well, Marcus cannot succeed on an individual claim for equitable relief under Section 502(a)(3) for breach of fiduciary duty. See Varity Corp. v. Howe, 516 U.S. 489 (1996)(ERISA Section 502(a)(3) provides "appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy"). Here, Section 502(a)(1)(B) provides an adequate remedy for both past-due and future

---

[8] Indeed, even if a heightened review were not required, under the arbitrary and capricious standard of review MetLife's decision to terminate benefits was clearly arbitrary since it is unreasonable to conclude that Marcus could perform work that MetLife previously found she could not do based on the same if not worsening medical conditions,

benefits.  <u>Blahuta-Glover v. Cyanamid Long Term Disability Plan</u>, 1996 WL 220977 at *4 (E.D.Pa. Apr. 30, 1996); <u>see also</u>, <u>Ream v. Frey</u>, 107 F.3d 147, 152-53 (3d Cir. 1997)(cautioning that "[w]here Congress otherwise has provided for appropriate relief for the injury suffered by a beneficiary, further equitable relief ought not be provided").  Here, Marcus has an appropriate remedy available under Section 502(a)(1)(B).  Accordingly, she cannot maintain an equitable claim under Section 502(a)(3) and defendant is entitled to summary judgment.

Lastly, we find that Marcus is not entitled to an award of additional benefits or to judicial estoppel.  First, she is entitled only to retroactive benefits, offset by any Social Security disability income, from the date of her termination (January 11, 2003) to the date upon which there is an entry of judgment in her favor, together with discretionary prejudgment interest as to past benefits, and reasonable attorney fees and costs, and to reinstatement of benefits, subject to the terms and provisions of her Plan.  <u>See</u> <u>Brown v. Continental Casualty Co.</u>, 348 F.Supp.2d 358, 369 (E.D.Pa. 2004); <u>Hunter v. Federal Express Corp.</u>,  2004 WL 1588229 AT *12-14 (E.D.Pa. 2004).

Secondly, the terms of the Plan required Marcus to apply for Social Security disability benefits and, thus, there appears to be no basis for judicial estoppel.  It is settled that "[j]udicial estoppel may be imposed only if: (1) the party to be

18

estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estopped is tailored to address the affront to the court's authority or integrity." Montrose Medical Group Participating Savings Plan v. Bulger, 243 F.3d 773, 777-78 (3d Cir. 2001).  None of these circumstances exists in this case.  Accordingly, defendant is entitled to summary judgment on Count III.

CONCLUSION

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of the plaintiff (doc. 21) be granted in part and denied in part.  It should be granted as to Count I since MetLife's termination of her disability benefits was arbitrary and capricious.  Her motion should be denied as to Counts II and III of the Complaint.  Defendant's cross motion for summary judgment (doc. 27) should be granted in part and denied in part.  It should be granted as to Counts II and III of the Complaint and denied as to Count I.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond

thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

                                          Respectfully submitted,

                                          /s/   Amy Reynolds Hay
                                          AMY REYNOLDS HAY,
                                          United States Magistrate Judge

Dated:    12 December, 2005

cc:   Hon. David S. Cercone
      United States District Judge

      Tybe A. Brett, Esquire
      Picadio, McCall, Miller & Norton
      600 Grant Street
      4710 USX Tower
      Pittsburgh, PA 15219

      Veronica W. Saltz, Esquire
      Saltz Polisher P.C.
      993 Old Eagle School Road
      Suite 412
      Wayne, PA 19087